IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 20, 2025

## JAMARCUS JACKSON v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Washington County**
**No. 39612      Stacy L. Street, Judge**

---

### No. E2025-00016-CCA-R3-ECN

---

In 2017, a Washington County jury convicted the Petitioner, Jamarcus Jackson, of misdemeanor assault, misdemeanor reckless endangerment, and second degree murder as a lesser-included offense of first degree murder. The trial court imposed a forty-year sentence. The Petitioner appealed and this court affirmed the judgments. *State v. Jackson*, No. E2017-01182-CCA-R3-CD, 2018 WL 3409927, at *1 (Tenn. Crim. App. July 12, 2018), *perm. app. denied* (Tenn. Nov. 15, 2018). Thereafter, the Petitioner filed a petition for post-conviction relief, which the post-conviction court denied following a hearing. We affirmed that decision on appeal. *Jackson v. State*, No. E2021-00642-CCA-R3-PC, 2022 WL 984341 (Tenn. Crim. App. Feb. 23, 2022), *no perm. app. filed.* In 2024, the Petitioner filed a petition for a writ of error *coram nobis*. The trial court summarily dismissed the petition as untimely and without merit. On appeal, the Petitioner contends that his petition is entitled to a tolling of the statute of limitations because of the unavailability of the newly discovered evidence. After review, we affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Jamarcus Jackson, Mountain City, Tennessee, Pro Se.

Jonathan Skrmetti, Attorney General and Reporter; Elizabeth Evan, Assistant Attorney General; and Steven Finney, District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts and Background

This case arises from the Petitioner's involvement in the shooting death of Deshaun Greer in Johnson City, Tennessee. In an opinion addressing his direct appeal, our court summarized the facts relevant to this opinion as follows:

> The [Petitioner's] convictions relate to events that occurred at The Battery, a Johnson City nightclub, in the early morning hours of March 23, 2014. The second degree murder conviction relates to the shooting death of Deshaun Greer. The assault conviction relates to Zachary Breedlove, and the reckless endangerment conviction relates to Jonathan McInturff.
>
> At the trial, Amanda Chappell, testified that she had been on two or three dates with the [Petitioner] before March 23, 2014. She said that on the night of the relevant events, they went to The Battery to celebrate the [Petitioner's] birthday. She said she picked up the [Petitioner] in the late evening, although she did not recall the time. She said that as she drove, she saw that the [Petitioner] had a small gun in the floorboard. She said the gun was not a revolver but did not know if it was a semi-automatic weapon. She said she was "[a] little bit" concerned about the [Petitioner's] having the gun. She did not know where the gun was located when they got out of the car at the club.
>
> . . . .
>
> Ms. Chappell testified that she and the [Petitioner] were about to leave when she saw the victim and someone who resembled the victim looking at the [Petitioner]. She said she later learned the men were brothers. She said she was concerned that an altercation might occur. She said that as she and the [Petitioner] stood by the bar in the back of the club after the [Petitioner] finished his conversation, the victim "bumped" the [Petitioner] intentionally and bumped her.
>
> . . . .
>
> Ms. Chappell testified that she saw the [Petitioner] leave and attempted to follow but had difficulty because she wore high heels. She said that she asked him to wait for her but that he did not. She said the [Petitioner] did not sprint but moved quickly to her car, which was a distance away. She said the [Petitioner] was angry, which was a state in which she had never seen him. She said he was loud and "breathing hard." She said that when she reached the car, the [Petitioner] stood by the passenger side waiting for

2

her to unlock it. She said the [Petitioner] searched the floorboard and asked, "Where's my gun[?]" She later said that he asked, "[W]here the F is my gun" and that he forcefully slammed back her car seat. . . . .

Ms. Chappell testified that she saw the [Petitioner] put the gun in the back of his pants and walk toward The Battery. She said she sat in the car for about one minute but returned to The Battery after hearing gunshots. She said that she saw someone lying down, that she looked at the person's shoes to see whether it was the [Petitioner], but that it was not. She looked for the [Petitioner] and found him lying at the bottom of some steps. She thought the [Petitioner] hit his head "because he wasn't . . . all there." She said that several people restrained the [Petitioner] and that she waited to leave until the police arrived and took the [Petitioner].

. . . .

John Calandros testified that he was employed as a bouncer at The Battery on March 23, 2014. Mr. Calandros said that he began focusing on the [Petitioner] after seeing the [Petitioner] in an incident with a patron other than the victim. When Mr. Calandros was asked if he saw the [Petitioner] become involved in an incident with the victim or the victim's brother, Mr. Calandros said, "[I]t looked like they kind of bumped shoulders and started talking aggressively toward one another." . . . .

Mr. Calandros said that the victim and the victim's brother wanted to go outside and that the victim stated the [Petitioner] had hit him in the face with a beer bottle. Mr. Calandros explained that he had not seen the [Petitioner] strike the victim but that he saw a "large pumpknot" on the victim's face. . . . .

Mr. Calandros testified that he did not usually work in the parking lot but that he had followed the victim and the victim's brother to ensure that they left. He said he heard the crowd saying, "[T]here he is, get him." Mr. Calandros said that the victim turned and that Mr. Calandros saw the [Petitioner] "coming up the street" on foot with his hands at his sides. Mr. Calandros said the victim turned and walked casually toward the [Petitioner] until they were four to six feet apart. Mr. Calandros said that the victim's brother also walked toward the [Petitioner,] but that the victim was closer to the [Petitioner] than the victim's brother. Mr. Calandros stated that the [Petitioner] pulled out a gun from the [Petitioner's] mid-back and began shooting. Mr. Calandros stated that he heard a couple of shots, that he felt

3

something possibly grazing his leg, and that he dove down. He said he heard more than five shots. He said that everything happened within a matter of seconds. Mr. Calandros said that although the victim had been "riled up" earlier, the victim was calm by the time the victim walked outside.

Mr. Calandros testified that by the time he stood, another bouncer, Michael Parr, was on top of the [Petitioner] in the lower parking lot. Mr. Calandros stated that another bouncer, "Devin," assisted Mr. Parr in restraining the [Petitioner]. Mr. Calandros said the location where the bouncers had restrained the [Petitioner] was different than where he had last seen the [Petitioner] before Mr. Calandros dove to the ground. Mr. Calandros stated that Mr. Phillips took the gun from the [Petitioner] and that one of the club's disc jockeys, John Lawson, kept the gun until the police arrived. . . . . Mr. Calandros identified the Defendant as the person he saw firing shots on March 23, 2014.

. . . .

The jury acquitted the [Petitioner] of the charged offense of first degree premeditated murder of the victim but found the [Petitioner] guilty of the lesser included offense of second degree murder. The jury found the [Petitioner] guilty of misdemeanor assault of [a second victim]. The jury acquitted the [Petitioner] of felony reckless endangerment but found the [Petitioner] guilty of the lesser included offense of misdemeanor reckless endangerment.

*Jackson*, 2018 WL 3409927, at *1-6. The trial court imposed concurrent sentences of forty years for second degree murder, and eleven months and twenty-nine days for each of the two misdemeanor convictions. The trial court imposed the second degree murder conviction consecutively to the sentence for a conviction in another case. *Id.* at *6. This court affirmed the judgments on direct appeal. *Id.* at *15.

On November 4, 2019, the Petitioner filed a *pro se* petition for post-conviction relief in which he raised a claim of ineffective assistance of counsel. Following the appointment of post-conviction counsel, the Petitioner filed an amended petition alleging that his trial counsel was ineffective for, among other things, failing to subpoena witnesses to corroborate the Petitioner's claim of self-defense. *Jackson*, 2022 WL 984341, at * 2.

On May 19, 2021, the post-conviction court entered a detailed written order denying the petition. The post-conviction court accredited the testimony of trial counsel that he discussed with the Petitioner the pros and cons of calling the witnesses, kept the Petitioner

4

fully informed of his difficulties with the witnesses, and made the strategic choice, in consultation with the Petitioner, of not further pursuing the witnesses or a continuance. The post-conviction court further found that neither witness's testimony would have changed the outcome of the trial, in which multiple witnesses offered similar testimony and the proof of the Petitioner's guilt was overwhelming. *Id.* at \*5.

On appeal, this court found that the evidence was that the Petitioner had chosen to proceed with the scheduled trial without the witnesses and agreed with and participated in trial counsel's strategic choice not to risk calling one of the witnesses. *Id.* We concluded, therefore, that the Petitioner had not met his burden of demonstrating that counsel was deficient in his performance, and, moreover, based on the similar testimony at trial to that of those potential witnesses, that the Petitioner was not prejudiced by their absence at his trial. *Id.* at \*6-7. We affirmed the post-conviction court's denial of his petition. *Id.* The Petitioner then filed a petition for a writ of *habeas corpus* in federal court, raising the ineffective assistance of counsel claim a second time, along with several other claims. In a memorandum opinion, the federal district court denied his petition on procedural grounds and dismissed the action. *Jackson v. Eller*, No. 3:23-CV-54-DCLC-JEM, 2024 WL 3609078, at \*1 (E.D. Tenn. July 30, 2024).

In 2024, the Petitioner filed a petition for a writ of error *coram nobis*, which is the subject of this appeal, alleging that newly discovered evidence in the form of notes from the prosecution indicated that a witness could have been impeached at trial. The *coram nobis* court dismissed the petition without a hearing because it was untimely and did not allege evidence of "actual innocence".

It is from this judgment that the Petitioner now appeals.

### III. Analysis

On appeal, the Petitioner argues that the *coram nobis* court erred when it denied his petition for a writ of error *coram nobis* as untimely because the claim for relief was subject to equitable tolling of the statute of limitations. He also contends that newly discovered evidence may have altered the judgment of the jury. The State responds that the *coram nobis* court properly determined that the petition was barred by the statute of limitations and not subject to tolling. The State further responds that the Petitioner did not present newly discovered evidence that was likely to change the outcome of his trial and thus, the trial court properly dismissed his petition for a writ of error *coram nobis*.

Tennessee Code Annotated section 40-26-105(b) provides, in pertinent part:

5

Upon a showing by the defendant that the defendant was without fault in failing to present certain evidence at the proper time, a writ of error coram nobis will lie for subsequently or newly discovered evidence relating to matters which are litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at trial.

The relief sought by a writ of error *coram nobis* is the setting aside of the conviction and the granting of a new trial. *Payne v. State*, 493 S.W.3d 478, 485 (Tenn. 2016) (citation omitted). "As a general rule, subsequently or newly discovered evidence which is simply cumulative to other evidence in the record . . . will not justify the granting of a petition for the writ of error *coram nobis* when the evidence, if introduced," might not have resulted in a different outcome. *State v. Hart*, 911 S.W.2d 371, 375 (Tenn. Crim. App. 1995) (citations omitted); *see also State v. Vasques*, 221 S.W.3d 514, 527-28 (Tenn. 2007) (noting that proper standard of review is whether the proffered evidence "might have" resulted in a different outcome rather than whether it "would have" resulted in a different one).

It is well-established that the writ of error *coram nobis* "is an extraordinary procedural remedy . . . [that] fills only a slight gap into which few cases fall." *State v. Mixon*, 983 S.W.2d 661, 672 (Tenn. 1999). The decision to grant or to deny a petition for the writ of error *coram nobis* on its merits rests within the sound discretion of the trial court. *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010) (citing *Vasques*, 221 S.W.3d at 527-28). We, therefore, review for abuse of discretion. *See State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002).

A petition for a writ of error *coram nobis* must be filed within one year of the judgment becoming final in the trial court. T.C.A. § 27-7-103. This statute of limitations "is computed from the date the judgment of the trial court becomes final, either thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed post-trial motion." *Nunley v. State*, 552 S.W.3d 800, 816 (Tenn. 2018) (quoting *Mixon*, 983 S.W.2d at 672); T.C.A. § 27-7-103. Compliance with the one-year statute of limitations is an "essential element of a *coram nobis* claim." *Nunley*, 552 S.W.3d at 828.

The Petitioner filed his petition for relief on November 4, 2024, almost seven years after the statutory period had expired in December of 2017. He contends, however, that the grounds for relief qualified as later-arising because the newly discovered notes from the prosecution's file indicated that one of the trial witnesses could have been impeached. The State responds that the petition was untimely and that the Petitioner has not presented evidence of actual innocence sufficient to toll the statute of limitations. We agree with the State.

6

If the *coram nobis* petition does not show on its face that it was filed within the one-year statute of limitations, the petition must set forth with particularity facts demonstrating that a petitioner is entitled to equitable tolling of the statute of limitations:

> To be entitled to equitable tolling, a prisoner must demonstrate with particularity in the petition: (1) that the ground or grounds upon which the prisoner is seeking relief are "later arising" grounds, that is grounds that arose after the point in time when the applicable statute of limitations normally would have started to run; [and] (2) that, based on the facts of the case, the strict application of the statute of limitations would effectively deny the prisoner a reasonable opportunity to present his or her claims. . . . A prisoner is not entitled to equitable tolling to pursue a patently non-meritorious ground for relief.

*See Nunley*, 552 S.W.3d at 831. "[T]he *coram nobis* statute of limitations may be tolled only if the petitioner produces newly discovered evidence that would, if true, establish clearly and convincingly that the petitioner is actually innocent of the underlying crime of which he was convicted." *Clardy v. State*, 691 S.W.3d 390, 407 (Tenn. 2024).

Reviewing the record and the petition, we find no error in the *coram nobis* court's decision to dismiss the petition. The newly discovered evidence was not "later-arising" and does not "clearly and convincingly show that the petitioner is actually innocent of the underlying crime, i.e., that the petitioner did not commit the crime." *Clardy*, 691 S.W.3d at 409. The Petitioner has not demonstrated that the newly discovered evidence establishes his actual innocence as required to entitle him to an equitable tolling of the statute of limitations as provided in Tennessee Code Annotated section 27-7-103. Therefore, the petition is untimely.

The inquiry ends if his petition is not timely and if he has failed to demonstrate that he is entitled to relief from the statute of limitations. On its face, the petition is untimely under the one-year statute of limitations, and it contains no specific facts showing a basis for holding that he is entitled to equitable tolling of the statute of limitations.

## IV. Conclusion

Based upon the foregoing reasoning and authorities, we affirm the *coram nobis* court's judgment.

S/ ***ROBERT W. WEDEMEYER***
ROBERT W. WEDEMEYER, JUDGE